Nott, J.,
delivered the opinion of the court:
The claimant has brought his action against the District of Columbia to recover $269.34, and the defendant has set up matters by way of counter-claim to the amount of $3,194.87. As to the claimant’s demand, it is conceded that he should recover. The real controversy grows out of the counter-claim.
*122 As to the first item of that counter-claim, $111.87, it arose in settlement of the same contract upon which the claimant sues, and it is a clear case of overpayment in mistake of fact, the mistake, moreover,' being clerical; i. e., the writing of 1,554 instead of 1,654. illhe court has not the slightest doubt of the defendant’s right to have it deducted from the claimant’s recovery. Graver and more doubtful questions spring out of the second and third items of the counter-claim, which are to recover back $2,740.40 and $342.60 for overpayments made in mistake of fact upon another and distinct contract. The essential facts relating to the former of these two counter-claims are these:
The board of public works of the former government of this District entered into a great number of contracts with many different contractors for grading, paving, and otherwise improving the streets of Washington. These contracts were prepared by the board and were upon printed blanks, and often were substantially in the same language. They provided that payments should be made upon the estimates and certificates of the chief engineer of the .board, and each contractor expressly agreed that no money should become due and payable under his contract “ exceptupon the certificate of said engineer,” and that he should not be entitled to demand or receive payment for any portion of his work “except in the manner set forth in this agreement.” The agreements also contained an article expressly declaring that the measurements should be made “by the engineer of the board or his assistant.”
In a word, these contracts belong to the class where the parties agree that a third person, ordinarily an architect or engineer, shall act as arbitrator between them in determining the quantity and quality of the work, and the contractor agrees to produce the engineer’s certificate of approval as a condition precedent to demanding payment. If the cases came into court to be determined according to the letter of each'contract, there could not be a doubt as to the effect of these provisions. But now we must take judicial cognizance of the fact that the contractors with the board of public works went to Congress for relief; that they asserted that the other contracting party had been delinquent in making payments; that they represented that in consequence of the haste in which measurements and estimates were made by the engineers and officers of the Dis *123 trict grave mistakes bad been made; and that they conceded that they had no legal remedy against the District, and appealed to the conscience of Congress as their only hope of redress. We also know that these appeals and these representations went on for years, and that the contracts, the proceedings and acts of the board of public works, the proceedings and acts of the board of audit, the accounts between- the parties, the estimates of the engineers, and every conceivable thing relating to the controversies were reported and made known to Congress. With this knowledge brought home in every conceivable way to every member of the two houses of Congress, the District-claims Act, 16th June, 1880 (1 Supplmt. B. S., 562), was passed. We cannot suppose that Congress passed that act in ignorance of the law of contracts or with the intent that this class of claimants should be turned out of court without legal redress. On the contrary, we believe that the statute is to be interpreted by the principle reiterated by this court in the Caldera Gases (15 C. Cls. B., 546), the Dahlgren Case (16 id., 30), and the case of Braden & Angus (td., 389,411), and that Congress as the supreme legislative power of the District, speaking for and in the stead of the defendant, agreed to waive the condition precedent prescribed by the contracts and to consent to an adjudication upon the merits.
In the present case, the defendant has established the fact that the claimant was paid in 1872 for laying 14,138]) square yards of Belgian pavement on Twelfth street. The fact is also established, to the satisfaction of the court, that the measurement then certified to by the defendant’s engineers was erroneous; that but 13,254 square yards were laid, and that there was consequently an error of 884 yards for which the claimant was overpaid. But his counsel strenuously contended on the hearing that this branch of the counter-claim must fail because the remeasurement had not been made by either of the engineers designated by the contract as the person who should make all measurements under it.
It may be conceded that that would be the result if the par-* ties had come into court in their original plight, with nothing between them but the contract as they originally made it; but they now come into court with what is substantially a subsequent agreement, that is to say, under the Act 1880, to the ■ terms, and conditions of which they have both consented, the *124 one by bringing Ms action, tbe other by the enactment of its supreme legislature; and the real question is, whether the benefit conferred by the act on the claimant in striking out, in effect, this clause of the contract is reciprocal, and whether, when the claimant has brought into court one contract, the defendant may bring into court another.
It must be conceded by all parties, it cannot be doubted by an3 rational mind, that the general purpose of Congress was to do justice between these parties. It cannot be supposed that Congress intended to throw down technicalities which stood in the way of the claimant and leave them standing in the wajr of the defendant. The legislative intent could not have been that a contractor might pick out one of a dozen distinct transactions ami bring it into court and recover a judgment upon it if he were really indebted to the District in the other eleven. Still, the practical question which follows is, whether Congress have effected this purpose of doing absolute justice between the parties by appropriate legislation, or whether it has been left a casus omissus.
The claimant brings his action to recover a balance due to him upon one contract, and the defendant seeks to recover back an alleged overpayment made upon another contract. This is not a defense in any manner growing out of the transaction which the claimant has brought into court, but is a distinct cause of action and must be sustained, if it can be sustained at all, as a cross-action seeking affirmative relief, under that provision of the Act 1880 (§3) which says that the Attorney-General shall have authority to defend the District of Columbia against all such claims in like manner as he is now by law required to defend the United States in said court, ioith the same power to interpose counter-claims and offsets.”
This term counter-claim is a term unknown to the common law, and indeed was first introduced into modern statutory practice by the New York Code of Procedure of 1848. It was then criticised as being a. term unknown to any system of law, but was soon interepreted in accordance with the comprehensive signification of its words as meaning something more than set-off and embracing every cause of action of like nature which might have been the subject of a separate action.
Furthermore, the District claims Act, by this reference to the previously existing statutory right of the United States as *125 defendants in this court “to interpose counter-claims and offsets,” in legal effect confers the right upon the District of Columbia as defendant here. The statutory provisions which define the right are to be found in the Revised Statutes, sections 1059,10G1. They provide for affirmative relief in favor of the government, and for the rendition and enforcement of judgments against claimants, as follows:
“ Sec. 1059. The Court of Claims shall have jurisdiction to hear and determine the following matters:
“ First. All claims founded upon any law of Congress, or upon any regulation of an executive department, or upon any contract, expressed or implied, witli the Government of the United States, and all claims which may be referred to it by either house of Congress.
“ Second. All set-offs, counter-claims, claims for damages, whether liquidated or unliquidated, or other demands whatsoever, on the part of the Government of the United States against any person making claim against the government in said court.
“Sec. 1061. Upon the trial of any cause in which any set-off, counter-claim, claim for damages, or other demand is set up on the part of the government against any person makiug claim against the government in said court, the court shall hear and determine such claim or demand both for and against the government and claimant; and if upon the whole case it finds that the claimant is indebted to the government, it shall render judgment to that effect, and such judgment shall be final, with the right of appeal, as in other cases provided for by law. Any transcript of such judgment, filed in the clerk’s office of any district or circuit court, shall be entered upon the records thereof, and shall thereby become and be a judgment of such court, and be enforced as other judgments m such courts are enforced.”
The District claims Act 1880 therefore must be administered as if it’said in express terms: “The jurisdiction of the Court of Claims is hereby extended to and shall have original, legal, and equitable jurisdiction, of all claims now existing against-the District of Columbia arising out of contracts made by the late board of public works,” &c., and of all set-offs, counter-claims, claims for damages, whether liquidated or unliquidated, or other demands whatsoever, on the part of the District of Columbia against any person making claim against the District in said court. Upon the trial of any cause in which any set-off, counter-claim, claim for damages, or other demand is set up on the part of the District against any person making claim against the District in said court, the court shall hear and de-: *126 termine such claim or demand both for and against the Disrict and claimant; and if upon the whole case it finds that the claimant is indebted to the District, it shall render judgment to that effect.
These provisions of the.act, coupled with the claimant’s voluntary bringing of his suit under and by virtue of the statute, are to all intents a stipulation between the parties. The one, the claimants, went to the other and said, “You ar.e indebted to us, though there are legal and technical defenses which stand in the way of a recovery, and we appeal to you to do us justice in paying that which is really due to us.” The other, Congress, replied, “We consent to waive all technical defenses, and agree that the Court of Claims may ascertain what amount, if any, is actually due to you upon the merits of each case; but upon condition that we may set up in the same suits “all claims for damages” which we may have against you, “ whether liquidated or unliquidated,” and all “other demands whatsoever”; and upon the further condition that “ the court shall hear and determine” these claims of yours against us, and our “ claims for damages” against you, “ and if upon the whole case it finds” that we are indebted to you it shall render judgment for the amount justly and legally due to you, but “if upon the whole case it finds” that you are really indebted to us “it sliall render judgment to that effect.”
With this stipulation graven on the threshold of every case, and with no claimant having a standing in court except by virtue of the stipulation, the power of the court to go to the root of every matter, legal or equitable, must be pronounced ample and complete. We are of the opinion that Congress intended that every claim of these claimants against the District, and every demand of the District against the claimants, should be determined upon the merits, and we conclude that the provisions in these contracts requiring measurements to be made and amounts to be determined by the engineers of the District no longer bind either party, and that the amount in which either party is indebted to the other may be established by legal and competent evidence as if no such provisions had ever existed in the contracts.
Passing no w to the merits of this branch of the counter-claim, we observe that it is to recover back money paid by the defendant to the claimant in alleged mistake of fact; that the mistake, *127 whatever it was, whether of measurement or computation, is not expressly and directly shown, and that all which appears is that the defendant paid for 14,138 square yards of pavement upon a certain street and between fixed boundaries, when, as now appears, the same area could not have contained more than 13,204 square yards.
Always in such actions a mistake of fact must be established; ordinarily the mistake itself, as such, must be shown. The action, moreover, must rest upon a mistake of fact, and not upon an error of judgment. There are cases where different processes will give different results, as in determining the distance of the earth from the sun; and cases where the same process under different manipulations will give varying results, as in chemical analysis; and there are also cases where the result is at best approximate and its exactitude more or less dependent upon the judgment or skill of him who makes the measurement; and in all such instances, we apprehend, the mistake actually committed must be positively shown, unless, perhaps, it were a very gross one. But a superficial measuerment of a certain and fixed area is not one of them. As to it, different processes will not give different results, nor will the same process vary under different manipulations; nor will the result depend upon the judgment of the engineer who makes the measurement and calculates the area in square yards. Fifty engineers making the same measurement would give the same answer to within the fraction of a yard. It is indeed incontrovertible that if the area paved now contains only 13,254 square yards of superficial space, the former estimate of 14,138 square yards of pavement necessarily was either a mistake or a fraud.
The third item of the counter-claim is likewise for an overpayment, but the mistake alleged is not that there ivas an error in the measurement of the work, but in the rate of payment allowed. The claimant had a contract for laying the same kind of pavement in different joortions of the same street. For pavement laid on one portion he was to be paid $3 a yard; for pavement laid on the other, $3.10. In August, 1872, he had laid 3,426 yards of the former and 9,193J yards of the latter. In an account dated August 1, 1872, the defendant’s officers put these two together and stated them in one item of 12,619J yards at $3 per yard. This was an error against the claimant. On the 1st September, 1875, the board of audit of the District of Columbia took *128 tip the matter for correction, again stated it in one item of 12,619£ yards, but gave $3.10 per yard as the rate to be allowed for the whole. This was an error against the defendant; $3.10 should have been allowed as the contract rate on 9,193£ yards, and not upon 12,619£ yards. But the amount allowed by the board of audit was paid to the claimant, and the defendant seeks to recover back ten cents per yard on 3,426 yards, amounting to $342.60.
The counsel for the claimant says in reply to this demand that the item was an award made by the board of audit, and that this court cannot overturn a settlement made by the board, inasmuch as the District claims Act 1880 (1 Supplmt. R.S., 563 § 8) precludes this court from considering any claim “ which was rejected by the board of audit;” hence, it is argued, if the awards of the board of audit are not regarded as final generally, there will be this anomaly: that if there were two mistakes committed by it, the one for and the other against a claimant, the court could correct the one and not the other.
The Assistant Attorney-G-eneral replies to this that the settlements of the board of audit were not final awards; and that • as to this settlement or allowance in favor of this claimant, the board was without jurisdiction; for the Act 20th June, 1874 (18 Stat. L., 116, § 6), which created the board, expressly provided that no claim should be “audited or allowed unless presented within ninety days” after the first publication of a notice prescribed by the statute; and the first presentation of this claim, so far as appears by the record, was not till the 20th August, 1875.
To this the counsel for the claimant rejoins:
1. That the communication which the claimant sent to the board of audit on the 20th August, 1875, shows on its face that the claim was already pending and under consideration; that the board, as they reported to a committee of Congress (H. Mis. Doc. 103, Part 2, Forty-fourth Congress, seventh answer), did not require a formal presentation of claims in cases like this, and that the determination of what facts constituted a presentation was a question for the board to determine within the decision of this court in the case of Greencastle Bank (15 O. Ols. B., 225).
2 That Congress have ratified all cases acted upon favorably by the board of audit, inasmuch as they have directed the *129 Treasurer “ to redeem the outstanding certificates of .the late board of audit.” (District claims Act■ 1880, (1 Supplint. E. S., 562, § 9.)
Upon these facts and arguments the court has reached the following conclusions:
1. The Bank of Oreencastle Case (15 C. Ols. E., 225) is not authority for holding that the board of audit could have audited or allowed claims which had not actually beeu presented by the claimant within the times designated by the Act 20th June, 1874; Joint Resolution 21st December, 1874; Act 3d March, 1875 (18 Stat. L., 116, § 6; ibid., 523; 509). What that case decided was that if the Commissioner of Internal Eevenue had deduced from evidence before him a jurisdictional fact, which it was his duty to determine, this court would not retry the case, as to the existence of that fact, upon the same or other evidence, aud iiossibly determine it the other way; but the decision did not intimate that the Commissioner could dispense with jurisdictional conditions imposed by statute, or modify them, or substitute a nominal for an actual compliance with them.
2. The court is also of the opinion that the board of audit was not a board, of arbitration, and that the element of finality, which is an attribute of judicial and quasi judicial, bodies, does not attach to its decisions. The financial affairs of the District of Columbia being in great confusion, and the District government which had incurred the debts having been abolished, Congress selected the two chief accounting officers of the general government and directed them to examine and audit the unsettled claims and demands against the District. The language of the statute is:
“That it shall be the duty of the First Comptroller of the Treasury and the Second Comptroller of the Treasury of the United States, who are hereby constituted a board of audit, to examine and audit for settlement all the unfunded or floating debt of the District of Columbia and of the board of public works hereinafter specified.”
The duties assigned to these officers by the act differed not essentially from those which they performed for the national government. Moreover, they were expressly authorized by the act to employ “accountants” “and such other assistants as they may deem necessary to make examination of said books, *130 vouchers, and papers, and discharge their other duties under this act.” No hearing was secured by the statute for the claimants, nor is .there anything in it which indicates that the First and Second Comptrollers were to adjudge the rights of any person. The term “board of audit” seems to have been employed to secure the joint or concurrent action of the two officers, and the “ power to subpoena witnesses, administer oaths, and examine witnesses under oath,” which looks much like the machinery of a judicial body, is expressly limited to “ the purposes hereinbefore specified,” and those purposes are expressly defined by the words “ to examine and audit for settlement,” “to ascertain the amount of sewer tax or assessment paid by any person,” “to ascertain and report to Congress the amount equitably chargeable to the street railroad companies on account of paving.” In a word, Congress set accounting officers to do the work of accounting officers; and the results of their exparte labors come within the characterization of the Supreme Court in Ghorpemving’s Case (94 U. S. B., 397).
3. The courtis also of the opinion that the subsequent legislation of Congress does not operate as an absolute or general ratification of the settlements made by the board of audit, nor place them above such judicial review as might be applicable to like conclusions of other accounting officers. It is true that Congress have made provision for the payment of those claims which were audited and allowed by the board, and have excluded the rejected claims from the jurisdiction of this court. [Act 20th June, 1874, 18 Stat, L., 116, § 7; District claims Act 1880. Supplmt. B. S., 562, §§ 8, 9). But this legislation does not take such cases out of the operation of ordinary rules of law nor change the character of the settlements or allowances or decisions which the board of audit made. The case is as if a merchant should order his bookkeeper to examine, audit, and report upon a number of accounts against his ship, and the bookkeeper should audit some and reject others, and the merchant should pay those which were audited and should refuse to pay those which were rejected. Assuredly it 'could not be maintained that the merchant by paying such claims had ratified the report as against himself, and had attached the character of an arbitrator to his own bookkeeper and had closed his own mouth against ever saying that he had overpaid one of those claims in mistake of fact.
*131 Finally it is to be observed tliat the board of audit, or rather their accountant, when lie stated the item of “ 12,619J square yards Belgian pavement, 310, $39,120.45,” appended thereto the following explanatory note:
“$3 10 is the price specified in the contract, and wa sttie regular board price, instead of $3, the amount allowed in the measurement.”
At the trial, the counsel for the claimant strenuously insisted that this note referred to a scale of rates which the former board of public works established during the performance of .the contracts, and that these increased rates were allowed to contractors irrespective of the rates specified in their contracts. It is manifest that if such an advance of payment was in fact allowed by the board of public works it might be sustained as a subsequent parol contract, or, if not sustainable, that it would at least characterize the payment as one made in mistake of law.
But while there is evidence to show that the board did establish rates in the manner above indicated, no tariff or scale rates has been discovered which can be applicable to the pavement of this street, or which can affect this contractor’s agreement. The mistake therefore remains a mistake of fact. Whether the board of audit supposed that the contract rate for all of the work was $3.10 per yard, or whether the board supposed that the former board of public works had increased the original contract price to that rate, is immaterial, for both suppositional facts were unfounded.
The conclusion of the court is that the defendant should recover :
Upon the first item of the counter-claim. $111 87
Upon the second item of the counter-claim. 2, 740 40
Upon the third item of the counter-claim. 342 00
Amounting to. 3,194 87
And that the claimant should recover. 269 34
Leaving a balance of. 2, 925 53
And that upon the whole case judgment be rendered against the claimant and in favor of the defendant for the sum of $2,925.53.